UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| WORLD CLASS CONSTRUCTION MANAGEMENT GROUP, ET AL. Plaintiffs, v. BRYNEE BAYLOR, ET AL. Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) | Civil No. 11-1682 (RCL) |
| AND | ) ) | |
| SHELDON ARPAD, ET AL. Plaintiffs, v. BRYNEE BAYLOR, ET AL. Defendants | ) ) ) ) ) ) ) ) ) ) ) ) | Civil No. 12-0069 (RCL) |

## MEMORANDUM OPINION

Plaintiffs World Class Construction Management Group ("WCCM") and William Barrett and plaintiffs Sheldon and Diane Arpad bring these suits against defendants Brynee Baylor and Baylor and Jackson, P.L.L.C. ("B&J") for allegedly breaching escrow agreements and defrauding them.

The plaintiffs in both cases now move for partial summary judgment on the counts of breach of contract, breach of fiduciary duty, and negligence. Upon consideration of WCCM and Barrett's motion [7] for partial summary judgment and Baylor's opposition [10] thereto, the

Court will DENY their motion. Upon consideration of the Arpads' motion [12] for summary judgment and Baylor's opposition [14] thereto, the Court will DENY their motion.

I.  **BACKGROUND**

Both actions consist of similar and overlapping facts. In January 2011, William Youngblood sought financing of approximately $20 million to buy a plot of land in Prince George's County, Maryland, and build a 121-room hotel on it. He approached The Milan Group, which agreed to arrange the loan if Youngblood could provide a $500,000 deposit to facilitate the loan and pay administrative costs and fees. To acquire this sum, Youngblood requested loans of $130,000 from plaintiff William Barrett's company, WCCM, and of $140,000 from plaintiffs Sheldon and Diane Arpad and offered to double their returns by February 10, 2011. Both plaintiffs agreed and formalized the arrangements in two memoranda of understanding ("MOUs") on January 17, 2011.

According to the MOUs, WCCM and the Arpads were to wire their contributions on January 18 and 19, respectively, directly to an escrow account maintained by B&J, a law firm retained by The Milan Group and controlled by defendant Brynee Baylor. According to each of their escrow agreements with B&J, B&J was "under no circumstances [to] release all or any part of the deposit[s] until . . . [the] Loan Provider/Facilitator [The Milan Group] . . . provide[d] written confirmation to the Investor[s] [WCCM and the Arpads] that the *loan ha[d] been approved and the funding w[ould] take place on or before February 1, 2011*." WCCM Am. Compl. Ex. 4; Arpad Compl. Ex. 3 (emphasis added).

Frank Lorenzo, the CEO of The Milan Group, then sent two letters "to whom it may concern" (but presumably to the plaintiffs[1]) with both letters dated January 18, 2011. In one

---

[1] Adding to the inherent obscurity of Lorenzo's addressing these letters "to whom it may concern," the plaintiffs provide little clarity as to which letters they actually received and which, if any, they did not. The plaintiffs have not

letter, he informed the plaintiffs that The Milan Group was facilitating the loan for Youngblood and guaranteed the loan would come through by or before February 15, 2011. He promised that if funding was delayed or ultimately not completed for any reason, The Milan Group would be fully responsible for returning $130,000 to WCCM and $140,000 to the Arpads. In the other January 18 letter, Lorenzo stated that The Milan Group had "received a commitment for the loan from HSBC London and [was] anticipating a closing by or before February 10, 2011." Def.'s Opposition to WCCM, Ex. 5.

On January 18 and 19, WCCM's and the Arpads' wire transfers of $130,000 and $140,000 went through as scheduled to B&J's escrow account. Baylor testifies that during these events she spoke with Sid Dugar, an attorney representing both plaintiffs, who confirmed the plaintiffs were aware that, based on Lorenzo's communications, the funding would most likely arrive after February 1 but that they still wanted to move ahead with the transactions.

Allegedly interpreting the foregoing events as satisfying the conditions of the escrow agreement, Baylor made two withdrawals from the escrow account in the amounts of $25,000 and $18,600 on January 20, 2011. Then, on January 25, 2011, she wired $75,000 from the escrow account to The Milan Group.[2] The plaintiffs allege that these actions violated the escrow agreement and are sufficient to establish breach of contract, breach of fiduciary duty, and negligence and move for partial summary judgment on these counts.[3] This court exercises diversity jurisdiction over these claims pursuant to 28 U.S.C. § 1332.

---

contended that they did not receive both letters and themselves supplied copies of the first letter discussed below as exhibits in their complaints. As discussed *infra* at 7, the court will infer the plaintiffs received both letters because this inference is most favorable to the parties not moving for summary judgment.

[2] To further support this action, Baylor testifies to having spoken on January 24 with a director at the Sudtirol Bank, one of the institutions participating in Youngblood's loan, who confirmed both over the phone and in a letter that the bank had issued letters of credit necessary to facilitate the loan.

[3] Both plaintiffs also allege fraud but do not presently move for summary judgment on that count.

3

Over the succeeding few weeks, the plaintiffs received several letters from Baylor and The Milan Group indicating the loan was only a few brief steps from completion. Eventually, the loan fell through allegedly because one of the participants involved disagreed over the conditions of the financing and The Milan Group could not find an alternative to that participant's involvement. Later, it surfaced that "Frank Lorenzo" was actually an alias for Frank Pavlico, who had previously been convicted of money laundering. In November 2011, the Securities and Exchange Commission initiated a securities fraud action against Pavlico, The Milan Group, Baylor, B&J, and others, alleging that they were all involved in an elaborate scheme to defraud approximately 13 investors out of $2.1 million. That case is currently pending in this court before Judge Collyer. *SEC v. The Milan Group, Inc.*, *et. al.*, No. 11-cv-2132 (D.D.C. 2011).

## II. LEGAL STANDARD

### A. Summary Judgment

Summary judgment is reserved only for cases in which "[1] there is no genuine dispute as to any material fact and [2] the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A dispute about a material fact "is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The moving party bears the burden of demonstrating the absence of any genuinely disputed material facts. *Celotex Corp. v.* Catrett, 477 U.S. 317, 322 (1986). Once it satisfies that burden, the moving party is "'entitled to judgment as a matter of law' if the nonmoving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Lathram v.* Snow, 336 F.3d 1085, 1088 (D.C. Cir. 2003)

(quoting *Celotex,* 477 U.S. at 322). In making these determinations, the court "must view the evidence in the light most favorable to [the nonmoving party], draw all reasonable inferences in her favor, and eschew making credibility determinations or weighing the evidence." *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003).

### B. Breach of Contract, Breach of Fiduciary Duty, and Negligence

District of Columbia law covering the three counts the plaintiffs seek partial summary judgment for is well established and firmly rooted in the common law. First, "[t]o prevail on a claim of breach of contract, a party must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by the breach." *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009). Second, to establish breach of fiduciary duty, plaintiffs must demonstrate that a fiduciary duty existed; was violated; and, to recover compensatory damages, proximately caused injury to the plaintiff. *Command Consulting Group, LLC v. Neuraliq, Inc.*, 623 F.Supp.2d 49, 54 (D.D.C. 2009); *Vicki Bagley Realty, Inc. v. Laufer*, 482 A.2d 359, 363 (D.C. 1984). While the "mere existence of a contract generally does not give rise to a fiduciary duty" (*Command Consulting*, 623 F.Supp.2d at 54), the D.C. Court of Appeals has held that escrow agents indeed have fiduciary duties to those parties who transfer funds into an escrow as well as those for whom the funds are held. *Wagman v. Lee*, 457 A.2d 401, 404–05 (D.C. 1983). Finally, a plaintiff can only prove negligence if "(1) the defendant owed a duty of care to the plaintiff, (2) the defendant breached that duty, and (3) the breach of duty proximately caused damage to the plaintiff." *Tolu v. Ayodeji*, 945 A.2d 596, 601 (D.C. 2008).

## III. ANALYSIS

Properly resolving these motions requires carefully identifying the alleged facts and construing all inferences from these facts in a light most favorable to the defendants. After undertaking these actions, the court concludes that it cannot at this time award the plaintiffs partial summary judgment.

The three causes of action in the plaintiffs' motions all arise out of Baylor's January 20 withdrawals and January 25 transfer from the escrow account. The plaintiffs allege that these actions violated the provisions of their escrow agreements that prohibited B&J from releasing any of the funds until The Milan Group "provide[d] written confirmation to [the plaintiffs] that the loan ha[d] been approved and the funding [would] take place on or before February 1, 2011." WCCM Amend. Compl. ¶ 7; Arpad Compl. ¶ 7; *see also* 28 Am. Jur. 2d Escrow § 15 (providing that legal title to funds in an escrow remain with the depositor until the event upon which they are to be delivered to the recipient occurs). The central question, therefore, is whether Baylor's withdrawals and transfer occurred after The Milan Group provided the plaintiffs with the confirmation described in the escrow agreement, and were thus authorized. If so, the element of breach contained in all three causes of action is not satisfied.[4]

At this point in the litigation, construing inferences in a light most favorable to Baylor shows that there are still material facts in genuine dispute as to whether Baylor breached her duty.[5] The Milan Group's January 18 letter in which it claimed to have "received a commitment

---

[4] The plaintiffs also allege that Baylor breached her duty by withdrawing the funds on January 20 directly "for [her] own personal use" rather than transferring them to The Milan Group. WCCM Am. Compl. ¶ 7. Baylor claims that these withdrawals were to cover legal fees and that The Milan Group authorized them to avoid the complications of wiring money to The Milan Group only for it to wire the money back to B&J. Baylor Aff. ¶ 15. The court has no evidence to the contrary at this point and therefore cannot assume that the withdrawals were in any way improper.

[5] Summary judgment is also inappropriate at this stage because the plaintiffs have not yet explained why they should be allowed to "pierce the corporate veil" and hold Baylor personally liable for the breach of contract and breach of fiduciary duty counts. District of Columbia law allows plaintiffs to pierce the veil rarely and on a case-by-case basis when the facts demonstrate that there is "(1) unity of ownership and interest and (2) use of the corporate form to

for the loan from HSBC London and [was] anticipating a closing by or before February 10, 2011," together with the other communications the defendant alleges took place during this time, may well satisfy the requirement envisioned by the escrow agreements—that is, a (1) written confirmation (2) provided to the plaintiffs that (3) the loan had been approved and that (4) the funding would take place on or before February 1, 2011.

The first three elements appear present in the Milan Group letter. First, the letter was clearly a "written confirmation." Second, the plaintiffs make no allegation that they did not receive the letter; thus at this stage, the court must presume that it was "provided to the plaintiffs." Third, the letter's statement that The Milan Group had "received a commitment for the loan from HSBC London" may reasonably justify the inference that the loan had been approved, and the plaintiffs make no allegation that it somehow does not.

The fourth element presents only minor difficulties. The letter claims that The Milan Group was "anticipating a closing by or before February 10, 2011"—not February 1 as the escrow agreements require. However, Baylor attests that that the plaintiffs were aware the funding would likely arrive later than the escrow agreements indicated but nevertheless consented to moving ahead with the agreement. Furthermore, the plaintiffs received the other

---

perpetuate fraud or wrong, or other considerations of justice and equity justify it." *Estate of Raleigh v. Mitchell*, 947 A.2d 464, 470 (D.C. 2008) (citations omitted); *see also* 1 William Meade Fletcher, et al., FLETCHER CYCLOPEDIA OF THE LAW OF THE LAW OF CORPORATIONS §§ 41–41.95 (perm. ed., rev. 2006) (elaborating on this doctrine). In breach of contract actions, piercing the corporate veil allows individual corporate owners to be held liable for breaching contracts between their corporations and third parties, even though they were not personally in privity with the third parties. *McWilliams Ballard Inc., v. Broadway Management Co., Inc.*, 636 F. Supp. 2d 1, 8 n.9 (D.D.C. 2009) (citing *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009)). Plaintiffs may well be able to justify piercing the veil, but they have not yet presented an argument to that effect.

For the fraud and negligence counts, piercing the veil may be unnecessary. "Under D.C. law, corporate officers are personally liable for torts which they commit, participate in, or inspire, even though the acts are performed in the name of the corporation." *McWilliams Ballard Inc., v. Broadway Management Co., Inc.*, 636 F. Supp. 2d 1, 9 (D.D.C. 2009) (internal quotation marks omitted) (citation omitted). The plaintiffs allege that Baylor herself removed the funds from the escrow, making her personally liable if this action was tortious.

January 18 letter in which The Milan Group guaranteed funding "by or before February 15, 2011." This perhaps gave them further notice that the funding would likely arrive later than February 1, yet they moved ahead with the arrangement anyway. The plaintiffs have not testified to having in any way objected to a later date, and it is a reasonable inference to assume that the delay of a few weeks would not have led them to cancel the entire deal. Consequently, the court could easily assume the plaintiffs consented to this slight modification of the terms of the escrow agreements.

Such possibilities mean that genuine disputes as to material facts still exist at this time. Therefore, the plaintiffs will not be able to succeed unless they present additional evidence dispelling these possibilities or persuade a jury they are not true. Such additional evidence may surface upon resolution of the pending action brought by the SEC against the defendants. At this stage, however, the court does not have sufficient evidence to satisfy the summary judgment standard.

**CONCLUSION**

In summary, the evidence supplied by the plaintiffs in both actions does not satisfy their burden for summary judgment. Material facts are still in genuine dispute about whether the defendants breached their duty to the plaintiffs when they released the funds held in escrow. As a result, partial summary judgment in both actions will be DENIED.

A separate Order consistent with this Memorandum Opinion shall issue this date.

Signed by Royce C. Lamberth, District Judge, on August 27, 2013.